Cite as 2019 Ark. App. 603

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CV-19-149

| | |
|---|---|
| JASON PAPAGEORGE | **Opinion Delivered:** December 11, 2019 |
| APPELLANT | APPEAL FROM THE ARKANSAS WORKERS' COMPENSATION COMMISSION [NO. G603438] |
| V. | |
| TYSON SHARED SERVICES, INC., AND TYNET CORPORATION | |
| APPELLEES | AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Jason Papageorge brought a workers'-compensation claim alleging that he sustained compensable neck and spinal-cord injuries while working for appellee Tyson Shared Services, Inc. (Tyson), in the early morning hours of March 16, 2016. Jason was a salesman for Tyson, and his claim arose out of a one-car automobile accident that occurred while he was driving from his house to the Northwest Arkansas Regional Airport in anticipation of traveling to meet with an out-of-state customer. The claim was originally accepted by Tyson as compensable. However, Tyson subsequently controverted the claim after learning that Jason's blood had tested positive for alcohol at Springfield Mercy Hospital on the morning of the accident. Tyson relied on the statutory presumption that the accident was substantially occasioned by the use of alcohol.

After a hearing, the administrative law judge (ALJ) denied compensability of Jason's claim. The ALJ found that the presence of alcohol created a rebuttable presumption that

the accident was substantially occasioned by alcohol, and that Jason was not entitled to compensation because he failed to prove by a preponderance of the evidence that alcohol did not substantially occasion the accident. The Arkansas Workers' Compensation Commission affirmed and adopted the ALJ's findings.

Jason now appeals from the Commission's decision denying compensability. On appeal, he argues that the Commission erred in relying on the statutory presumption to deny benefits because he plainly and clearly rebutted the presumption. We affirm.

The statutory presumption at issue in this case is encompassed in Arkansas Code Annotated section 11-9-102(4)(B)(iv) (Repl. 2012), which provides:

> (B) "Compensable injury" does not include:
>
> . . . .
>
> (iv)*(a)* Injury where the accident was substantially occasioned by the use of alcohol, illegal drugs, or prescription drugs used in contravention of physician's orders.
>
> *(b)* The presence of alcohol, illegal drugs, or prescription drugs used in contravention of a physician's orders shall create a rebuttable presumption that the injury or accident was substantially occasioned by the use of alcohol, illegal drugs, or prescription drugs used in contravention of physician's orders.
>
> *(c)* Every employee is deemed by his or her performance of services to have impliedly consented to reasonable and responsible testing by properly trained medical or law enforcement personnel for the presence of any of the aforementioned substances in the employee's body.
>
> *(d)* An employee shall not be entitled to compensation unless it is proved by a preponderance of the evidence that the alcohol, illegal drugs, or prescription drugs utilized in contravention of the physician's orders did not substantially occasion the injury or accident.

When the Commission denies benefits because the claimant has failed to meet his burden of proof, the substantial-evidence standard of proof requires that we affirm if the

Commission's decision displays a substantial basis for the denial of relief. *Ayers v. City of Ashdown*, 2014 Ark. App. 270. We view the evidence in the light most favorable to the Commission's decision, which will be affirmed if it is supported by substantial evidence. *Parker v. Comcast Cable Corp.*, 100 Ark. App. 400, 219 S.W.3d 391 (2007). The issue is not whether the appellate court might have reached a different result from the Commission, but whether reasonable minds could reach the result found by the Commission; if so, the appellate court must affirm. *Id*. We defer to the Commission's findings of credibility and the resolution of conflicting evidence. *Welcher v. Davis Nursing Home*, 2009 Ark. App. 831.

The record shows that on the night before the accident, Jason and his wife, Shelby, had returned home to northwest Arkansas from their honeymoon in Bora Bora. Their long day of travel included consecutive flights from Bora Bora to Tahiti, Los Angeles, Dallas, and to their final destination at the Northwest Arkansas Regional Airport. They arrived at the Northwest Arkansas Regional Airport at around 8:00 p.m. Jason's job as a salesman involved extensive travel, and he was scheduled to leave on a business flight to Minnesota at 5:00 a.m. the next morning.

Jason set his alarm for 3:30 a.m. but did not awake until 3:50 a.m. While driving to the airport in an attempt to catch his flight, Jason failed to negotiate a curve and flipped his car two or three times. The accident occurred shortly before 4:30 a.m., and Jason was taken by ambulance to Washington Regional Medical Center. He was subsequently flown to Springfield Mercy Hospital, where he underwent neck and back surgery. A blood draw taken at 9:26 a.m. at Springfield Mercy Hospital detected alcohol in Jason's blood at a

concentration of 110 milligrams per deciliter. As a result of the accident, Jason suffered complete paralysis below his chest and partial paralysis in his arms and hands.

Jason testified about consuming alcohol during periods of his travel home from Bora Bora as well as on that night after returning home. According to Jason, he did not drink on the flight from Bora Bora to Tahiti. Upon boarding the plane from Tahiti to Los Angeles, Jason drank a mimosa but did not drink for the remainder of the flight. Jason stated that during the flight from Los Angeles to Dallas, he ate a meal but did not recall consuming any alcohol. While at the Dallas airport, Jason ate a dish of chicken panini and drank a Bud Light. On the flight from Dallas to the Northwest Arkansas Regional Airport, Jason drank two glasses of red wine.

When Jason and Shelby arrived at the Northwest Arkansas Regional Airport at around 8:00 p.m., Jason's parents met them there and provided them sandwiches for dinner. In the airport parking lot Shelby asked Jason if he was okay to drive, and he said that he was and he drove them home. When Jason arrived home, he ate his sandwich and some chips and drank a Bud Light. Thereafter, Jason unpacked and was making preparations for the next morning's early flight, during which he drank some more beer. Jason could not remember exactly how many beers he drank, but he thought it was two or three. Jason testified that he drank his last Bud Light at about 10:00 p.m. and went to bed around 11:00 p.m.

Jason slept through his alarm, awoke at 3:50 a.m., and left for the airport without eating breakfast. Jason testified that he was frantically trying to make his flight and was driving through a construction zone at sixty miles an hour when he went through a curve,

4

jerked the steering wheel, overcorrected, and flipped his car two or three times. Jason testified that he is familiar with this stretch of road and should have been going thirty miles an hour, but that he made an error in judgment by driving too fast. Jason stated that at the time of the accident he was not impaired in any way by alcohol and that the accident occurred because he was driving too fast around a dangerous curve.

The first person to respond to Jason's accident was Chris Rayl. Chris testified that he was driving to the gym that morning when he saw Jason's car upside down on its roof. Chris called 911 and conversed with Jason until emergency personnel arrived. Chris observed a strong odor of burning plastic that dissipated when the car shut off. Chris described his conversation with Jason as "really calm" and stated that Jason was communicating very clearly. Chris did not smell alcohol and did not suspect that Jason was intoxicated. When asked on cross-examination whether Jason was intoxicated, Chris stated that he "couldn't tell either way."

Patrick Kabanuck, a paramedic, arrived at the scene and asked Jason standard assessment questions while waiting for an emergency unit to arrive. Patrick testified that Jason was fully alert and oriented and did not slur his speech. Patrick stated that he did not detect the smell of alcohol or observe anything to suggest that alcohol was involved in the accident. Patrick also stated that, as a paramedic he cannot determine for sure whether someone is intoxicated, and that the only way to be sure would be through a blood test or sobriety test administered by a police officer.

After Jason was taken to Washington Regional Medical Center, he was visited by Corporal John Bright, who took his statement. Corporal Bright was not the investigating

5

officer but was asked by the investigating officer to take Jason's statement. When Corporal Bright arrived at the emergency room, Jason was lying in bed wearing a neck brace and there were IVs attached. Corporal Bright testified that Jason did not have difficulty giving a statement, and that Jason told him he was driving too fast and lost control of the car. Corporal Bright did not have any knowledge of alcohol consumption by Jason prior to the motor-vehicle accident. Although he was not the investigating officer and did not prepare the police report, Corporal Bright stated that the police report reflected that Jason appeared normal and was not impaired by alcohol. Corporal Bright also stated that, had he known Jason had consumed several alcoholic drinks within eight hours of the accident, he would have gone to the investigating officer and requested that he subpoena a blood draw.

Jason's wife, Shelby, testified on his behalf and generally agreed with Jason's account of his alcohol consumption on the night before the accident. Shelby stated that Jason did not appear intoxicated when they arrived at the airport the night before, nor did he appear impaired when she saw him at Washington Regional Medical Center the next morning. Jason's parents also testified, and they both observed no signs that Jason was intoxicated when they saw him at the airport the night before or at the hospital the next morning.

The medical records from Washington Regional Medical Center do not indicate that any testing was done to determine if alcohol was present in Jason's system, nor do they give any indication that Jason was suspected to be intoxicated. However, after Jason was flown to Springfield Mercy Hospital, a blood draw was performed there, and it indicated the presence of alcohol in Jason's blood.

6

Dr. Henry Simmons, a physician and toxicologist, testified as an expert witness. Dr. Simmons was asked by Tyson to review the medical records, deposition testimony, and associated documents related to Jason's car accident in order to form an opinion about the potential factor that alcohol played in causing the accident. Dr. Simmons authored a report, which was admitted into evidence and provides in pertinent part:

4. At the request of an attorney for Tyson Shared Services, Inc., I reviewed a set of documents pertaining to a single vehicle accident involving Mr. Jason Papageorge on 3/16/16. Specifically, I studied accident related medical records from Washington Regional Hospital in Fayetteville, Arkansas and Mercy Hospital in Springfield, Missouri; depositions from Shelby and Jason Papageorge; Claimant's Answers to Respondent's interrogatories and Requests for Production of Documents, in addition to literature referenced in Attachment 1. My purpose in so doing was to investigate the potential for the alcohol that he drank during the hours prior to the event to have played a causal role in the accident.

5. In brief, I concluded that Mr. Papageorge had consumed a toxicologically significant amount of alcohol during a relevant time. Furthermore, the amount of alcohol still circulating in his blood at the time of the accident prohibited the safe operation of a motor vehicle and it contributed significantly to the cause of the accident at issue. In the paragraphs that follow, I will outline the bases for my opinions which I hold with a reasonable degree of medical and toxicological "certainty" or probability. Should additional information become available, I reserve the right to amend my conclusions to the extent warranted by the new data.

. . . .

12. Unfortunately, the concentration of alcohol in the "blood" drawn at 09:26 at Mercy Hospital was found to be 110 mg/dL or 0.11%. If this concentration is that in whole blood, then even more than five hours after the accident, it still exceeded the statutory level of intoxication by a factor of about 1.37 or 37%.

13. However, in clinical settings alcohol concentrations are often determined in serum or plasma in which they are nearly the same. The laboratory report from Mercy Hospital does not specifically identify the matrix as whole blood, serum, or plasma. However, since the commonly used statutory level of 0.08% is ordinarily whole blood based and whole blood levels may differ significantly from those in simultaneously collected serum or plasma, the distinction is important. Plasma is what is left after white cells, red cells and platelets are removed from whole blood

7

and serum is the liquid that separates from clotted blood when it is spun in a centrifuge.

14. Using work published by Rainey to convert serum alcohol concentrations to their equivalents in whole blood within a 95% confidence interval, one finds that a 110 mg/dL level in serum corresponds to one in whole blood lying between 78.6 and 116 mg/dL. These values may also be written as 0.0786 to 0.116%. The midrange of this interval is 97.3 mg/dL or 0.0973%.

15. Based upon testimony from Mr. Papageorge and his wife, before the accident about six hours had passed since he finished his last meal and at least five hours since he last drank alcohol. Conservatively, all of the alcohol he drank on 3/15/2016 would have been absorbed from his gut and his concentration would have been falling in his blood from its maximum level for some time by 04:09 on 3/16/2016. Its concentration would have continued to drop thereafter as well.

16. Alcohol is largely metabolized by enzymes in the liver and to a much lesser degree is excreted in the urine, exhaled air and sweat. As this occurs, its concentration decreases in body fluids.

17. Although Mr. Papageorge had modestly elevated transaminase levels at Washington Regional just after the crash, additional testing clearly indicated that his liver function was normal at least up to the time of the accident. Transaminases are enzymes present at much higher levels in liver cells than in the blood. There is no indication in the discharge summary from Mercy Hospital that he developed functionally significant hepatic dysfunction at any time despite some elevations in his transaminase levels at Washington Regional Hospital which may have been due to hepatic compression given his suspension in the vehicle.

18. Persons in good health ordinarily clear alcohol from their blood at about 10 to 30 mg/dL/hr [i.e. 0.01 to 0.03%hr]. These clearance rates ordinarily increase up to a point with regular consumption of alcohol. Mr. Papageorge's precise, baseline clearance rate at the time of the accident is unknown but was likely normal given his good health. However, he experienced spinal shock post-accident which likely reduced blood flow through his liver and potentially depressed his alcohol clearance rate below his baseline, although his clearance was never at a standstill even prior to treatment. Both the Neosynephrine (phenylephrine) and fluids he received not only increased his blood pressure and perfusion but also specifically mitigated any hypoperfusion of the liver attributable to spinal shock.

19. If Mr. Papageorge's pre-accident rate of alcohol clearance were only 10 mg/dL/hr (0.01%/hr) and if his clearance rate had been hypothetically depressed 50% below its baseline to just 5 mg/dL/hr (0.005%/hr), which I doubt given his evident clinical picture, his whole blood alcohol level would still have exceeded 80

mg/dL or 0.08% at the time of his accident because it would have continued to fall to the time of the blood draw at 09:26 and beyond. This statement is valid even if one assumes that Mercy Hospital reported his concentration in serum and that, if again for his benefit, one assumes that his whole blood equivalent level lay at the lower end of the estimated whole blood range, 78.6 mg/dL (0.0786%), at 09:26 some five hours post–accident.

20. If the alcohol concentration reported by Mercy Hospital were that in whole blood instead of serum, the level would have exceeded 0.11% at the time of the accident.

21. Alcohol concentrations above 0.08% are ordinarily associated with impairments that significantly reduce one's ability to operate a motor vehicle safely. Examples include in part diminished attention, impaired judgment, compromised sensory function, reduced response times and some degree of sedation.

22. In this case, the impact of the alcohol compounded the after effects of 8 to 9 days of non-routine activities away from home in another time zone and aggravated the effects of receiving only 4 to 5 hours of sleep the night before.

23. In summary, Mr. Papageorge consumed a toxicologically significant amount of alcohol during a relevant period of time. The amount of alcohol circulating in blood at the time of the accident was sufficient to prohibit the safe operation of a motor vehicle. Consequently, within a reasonable degree of medical and toxicological probability or certainty, it is my opinion that alcohol contributed significantly to the cause of the accident at issue.

The deposition of Julie Witt, the core lab manager of operations at Springfield Mercy Hospital, was introduced as evidence of the validity of the blood draw. Julie testified that although it was not specified in the lab report, Jason's plasma was tested. Julie stated that the blood test was ordered by Thomas Lewis, and that after the blood was drawn it arrived at the lab with three indicators including the patient's full name, birth date, and either an epic number or Social Security number. Julie explained that a designated individual receives the sample in a pneumatic tube and submits it for analysis. There are safeguards built into the testing and parameters for calibration and quality control. Julie stated that the machine that runs the test is calibrated daily if needed based on FDA regulations, and that within a

half hour the test has been done and verified and the reliability of the result is assured enough to be published.

In Dr. Simmons's hearing testimony, he stated that when he authored his report about the contribution of alcohol to the accident, he was not yet aware of whether the blood draw tested Jason's whole blood or plasma. Dr. Simmons testified that after reviewing Julie Witt's deposition, he thought the test result was reliable. Dr. Simmons testified that, after hearing all the testimony at the hearing, he stood by the opinions given in his report. Dr. Simmons thought that at the time of the accident, Jason's blood-alcohol level was "at least in the 0.1 range using exceedingly conservative modeling." Dr. Simmons further testified Jason's apparent lack of appreciation of the danger of going into the curve at a high rate of speed suggests a problem with thinking and perception that was completely consistent with the effects of alcohol.[1]

In this appeal, Jason argues that the Commission erred in denying compensability for his workers'-compensation claim because he plainly and clearly rebutted the statutory presumption that the accident was substantially occasioned by the use of alcohol. Jason contends that despite the blood test showing the presence of alcohol in his system and the opinion of Dr. Simmons as to causation, he successfully rebutted the presumption because six witnesses who interacted with him the night before the accident and the morning of the accident all consistently testified that there was no indication that Jason was intoxicated or impaired. Jason asserts that the passerby who stopped to help him, the paramedic, and the

---

[1]We observe that Jason did not present any expert witness to refute Dr. Simmons's opinions.

police officer who took his statement at the hospital all testified that Jason was speaking clearly and coherently and did not smell of alcohol. Moreover, Jason's wife, mother, and father observed no sign of impairment when they saw Jason at the hospital.

Jason relies on *ERC Construction Yard & Sales v. Robertson*, 335 Ark. 63, 977 S.W.2d 212 (1998), where the supreme court stated that the meaning of the statutory phrase "substantially occasioned by the use of alcohol" requires that there be a direct causal link between the use of alcohol and the injury in order for the injury to be noncompensable. Jason contends that here there was no causal link between the use of alcohol and the car accident. Jason argues that the accident was instead caused by his driving too fast around a dangerous curve trying to make it to the airport on time to catch a business flight.

In support of his argument, Jason cites the companion cases *Edmisten v. Bull Shoals Boat Landing*, 2014 Ark. 89, 432 S.W.3d 25, and *Prock v. Bull Shoals Boat Landing*, 2014 Ark. 93, 431 S.W.3d 858. In these cases, Edmisten and Prock worked as welders and were instructed to get a couple of barrels and cut the tops off them. Prock used an acetylene torch to cut the tops off the barrels, and Edmisten assisted him by holding the tops of the barrels with channel locks. Prock cut the top off the first barrel without incident, but when he began cutting the second barrel, it exploded and both men were engulfed in flames. Prock testified that he had used acetylene torches to open the barrels at least fifteen to twenty times before the explosion and that neither his boss nor anyone else had ever objected to his opening the barrels that way. After the accident, both men tested positive for cannabinoids, which triggered the statutory presumption that the accident was substantially

11

occasioned by the use of illegal drugs.  The claimants' coworkers testified that neither of them appeared to be impaired on the day of the accident.

The Commission denied compensability of both Edmisten's and Prock's workers'-compensation claims, finding that both of them had failed to rebut the statutory presumption that the accident was substantially occasioned by their drug use.  However, in both *Edmisten* and *Prock*, our supreme court reversed the Commission's decision and awarded compensability.  In *Prock*, the supreme court wrote:

> The above evidence can be summarized by concluding that no one saw Prock intoxicated on the day of the accident, no one saw him ingest anything, no one had seen him impaired in any way at work on prior occasions, and, most importantly, that he performed a task that he had been asked to do in the same manner in which he had habitually performed it in the past.  After a review of the Commission's decision, we conclude that the Commission arbitrarily disregarded any testimony that supported Prock's claim in addition to twisting, or leaving out of its opinion altogether, certain testimony that supported Prock.  *See also Edmisten v. Bull Shoals Landing*, 2014 Ark. 89, 432 S.W.3d 25.  While it is true that appellate courts defer to the Commission on issues involving the weight of evidence and the credibility of witnesses and that it may be insulated to a certain degree, it is not so insulated as to render appellate review meaningless.  *See Freeman v. ConAgra Frozen Foods*, 344 Ark. 296, 40 S.W.3d 760 (2001).  The Commission may not arbitrarily disregard the testimony of any witness and, likewise, the Commission may not arbitrarily disregard other evidence submitted in support of a claim.

*Prock*, 2014 Ark. 93, at 15−16, 431 S.W.3d 858, 868−69.

Jason asserts that the present case is similar to *Edmisten* and *Prock* because no one saw him intoxicated or consuming alcohol on the day of the car accident.  Jason contends that, as in *Edmisten* and *Prock*, the Commission here arbitrarily disregarded the testimony supporting his claim.  Jason argues that the Commission erred in disregarding the testimony of the numerous witnesses who saw no signs that he was intoxicated that day, as well as medical records that failed to document any suspicion of intoxication.  Jason claims that had

the Commission properly considered this evidence, it would have found that he rebutted the statutory presumption. Jason thus asks that we reverse the Commission's decision denying compensability of his workers'-compensation claim and award him benefits.

We hold that the Commission's decision displays a substantial basis for denying compensability. A blood-alcohol test revealing even a low level of alcohol is sufficient to trigger the statutory presumption. *See ERC Contracting*, *supra*. In this case, the blood test at Springfield Mercy Hospital detected an amount of alcohol in Jason's blood that Dr. Simmons conservatively estimated would have been 0.1% at the time of the accident. Thus, there is no doubt that the statutory presumption was triggered here.

Despite the positive blood-alcohol test and the fact that Jason had admitted to drinking multiple beers several hours before the accident, Jason relies on the witnesses who saw no signs of his intoxication after the accident. However, the first of these witnesses, Chris Rayl, stated that he avoided looking at Jason because he did not want to witness his injuries and that he could not tell either way whether Jason was or was not intoxicated. The paramedic, Patrick Kabanuck, acknowledged that the only way to "truly determine" intoxication was through a blood test or sobriety test administered by a police officer. And Corporal Bright, who was not the investigating officer but took a statement from Jason at the hospital, testified that he would have requested a blood draw had he known that Jason had been drinking alcoholic beverages within the past eight hours. Finally, in Dr. Simmons's testimony, he indicated that the fact that witnesses did not smell alcohol on Jason's breath was not unusual and was irrelevant to Jason's blood-alcohol level.

13

Contrary to Jason's argument, this case is unlike *Edmisten* or *Prock* because here, the Commission did not disregard any testimony. In its opinion, the Commission specifically set forth all of the testimony upon which Jason now relies, and after considering that testimony, along with the testimony of Dr. Simmons, the Commission found that Jason failed to prove by a preponderance of the evidence that alcohol did not substantially occasion the car accident causing his injuries. This finding was supported by substantial evidence.

Dr. Simmons conservatively estimated a blood-alcohol level of 0.1% at the time of the accident. This is clearly a significant level given that it is unlawful to operate a motor vehicle if the alcohol concentration in the person's blood is 0.08% or more. *See* Ark. Code Ann. § 5-65-103(a)(2) (Repl. 2016). The purpose of our laws against driving while intoxicated is to prevent accidents and protect persons from injury. *Rogers v. State*, 94 Ark. App. 47, 224 S.W.3d 564 (2006).

Dr. Simmons indicated in his testimony that the concentration of alcohol in Jason's blood would impair his judgment, perception, and reaction time. Dr. Simmons thought that Jason's act of speeding through a curve in a construction zone and failing to respond in sufficient time to avoid an accident were consistent with the effects of alcohol.[2] Dr. Simmons's ultimate opinion was that alcohol contributed significantly to the cause of the car accident, and his opinion was credited by the Commission.

Pursuant to our standard of review, the issue is not whether we might have reached a different result or whether the evidence would have supported a contrary finding; if

---

[2]We note the marked difference between Jason's accident and the accident in *Edmisten* and *Prock*, which occurred when the claimants were merely trying to cut the top off a barrel in the manner that had been habitually employed in the past without incident.

reasonable minds could reach the Commission's conclusion, we must affirm its decision. *Ganus v. St. Bernard's Hosp., LLC*, 2015 Ark. App. 163, 457 S.W.3d 683. On this record, we hold that reasonable minds could reach the Commission's conclusion that Jason failed to rebut the presumption that the accident was substantially occasioned by the use of alcohol. Therefore, the Commission's decision denying compensability is affirmed.

Affirmed.

HARRISON and MURPHY, JJ., agree.

*Cullen & Co., PLLC*, by: *Tim Cullen*, for appellant.

*Roberts Law Firm, P.A.*, by: *Jeremy Swearingen* and *David Tyler Mills*, for appellees.